UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING COMMISSION,

                    Plaintiff,

        v.

AVRAHAM EISENBERG

                    Defendant.

Case No. 23-cv-00173

ECF Case

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT <u>AND COMMISSION REGULATIONS</u>**

**JURY TRIAL DEMANDED**

## I.    <u>INTRODUCTION</u>

1.    Between in or around October 11, 2022 and October 15, 2022 ("Relevant Period"), Avraham Eisenberg ("Eisenberg" or "Defendant") engaged in a manipulative and deceptive scheme to artificially inflate the price of swaps offered by Mango Markets, a decentralized digital asset exchange, culminating in the misappropriation of over $100 million from the platform.

2.    During the Relevant Period, Mango Markets offered to enter into, entered into, executed, and/or confirmed the execution of several different types of digital asset transactions, including derivatives and other leveraged, margined, or financed digital asset transactions. Mango Markets offered derivative contracts that constitute swaps under the Act, (the "MNGO-USDC Swaps"), referred to as "perpetual contracts" or "perpetual futures" on the platform. The MNGO-USDC Swaps were based on the relative value between two digital assets: (1) MNGO, a "native" token of Mango Markets, and (2) USDC, a stablecoin. Mango Markets also allowed users to engage in transactions it described as "borrowing," which allowed users to withdraw digital assets, including commodities in interstate commerce such as bitcoin, ether, and Tether, from the exchange with an obligation to "deposit or trade for the borrowed asset." The

maximum amount available to borrow was primarily based on, among other things, the value of the borrower's assets held on Mango Markets.

3.     The goal of Defendant's scheme was straightforward: to artificially inflate the value of his swap contract holdings on Mango Markets through price manipulation, so that he could "borrow" a significant amount of digital assets that he had no intention to repay. Defendant accomplished this scheme by manipulating the price of MNGO and, ultimately, the price of MNGO-USDC Swaps, through a type of scheme often referred to as "oracle manipulation."

4.     An oracle is a program that pulls data from an off-blockchain source and brings it onto the blockchain so that it may be used by smart contracts.  Mango Markets used an oracle ("Oracle") that pulled market price data from three different exchanges ("Exchange 1," "Exchange 2," and "Exchange 3," and collectively, the "Oracle Exchanges").  The prices from the Oracle determined the market prices of assets on Mango Markets, including the price of MNGO and USDC.

5.     In furtherance of his manipulative and deceptive scheme, Defendant purchased over 400 million MNGO-USDC Swaps on Mango Markets with a position size of approximately $19 million.  The price of MNGO-USDC Swaps was based on the price of MNGO and USDC traded on the Oracle Exchanges.  During the Relevant period, MNGO was a relatively illiquid asset, meaning that large transactions in MNGO would likely impact its price.  After establishing his MNGO-USDC Swap position, Defendant bought large quantities of MNGO on the Oracle Exchanges over a span of less than thirty minutes.  Defendant intended these purchases to cause—and they did in fact cause—the price of MNGO to spike briefly to highly inflated artificial levels on each of the Oracle Exchanges.  As a result, based on the inflated inputs from

the Oracle, the price of MNGO on Mango Markets jumped over 13-fold from about $0.04 to $0.54 per MNGO during this thirty-minute span.  The spike in MNGO caused a similar contemporaneous spike in the value of Defendant's MNGO-USDC Swaps.  Using the inflated value of his MNGO-USDC Swaps as collateral, Defendant "borrowed" from Mango Markets several digital assets, including bitcoin, ether, and Tether, totaling $114 million, comprising virtually all of Mango Markets's available liquidity.

6.      The value of Defendant's collateral, however, was an illusion caused by his manipulation.  After "borrowing" digital assets from Mango Markets, Defendant transferred the borrowed digital assets out of his Mango Markets account and ceased his manipulation of MNGO and the MNGO-USDC Swaps.  The price of MNGO quickly declined below its pre-manipulation level, and the value of his MNGO-USDC Swaps declined in tandem.  As a result, Defendant's borrowings became significantly undercollateralized, and Mango Markets was left holding a mostly empty bag.

7.      Through this conduct, Defendant has engaged, is engaging, or is about to engage in fraudulent and manipulative acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2022), specifically Sections 6(c)(1), 6(c)(3), and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), (3), 13(a)(2), and Regulations 180.1(a)(1)-(3) and 180.2, 17 C.F.R. §§ 180.1(a)(1)-(3), 180.2 (2022).

8.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin such acts and practices and compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

9.     Unless restrained and enjoined by this Court, Defendant is likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.     JURISDICTION AND VENUE

10.     **Jurisdiction**.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

11.     **Venue**.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendant is found in, inhabits, or transacts business in this District, and because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.

## III.     THE PARTIES

12.     Plaintiff **Commodity Futures Trading Commission** ("Commission" or "CFTC") is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and Regulations.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581 and its Eastern Regional Office at 290 Broadway, 6th Floor, New York, NY 10007.

13.     Defendant **Avraham Eisenberg**, of Suffern, New York and/or San Juan, Puerto Rico, is a natural person currently in federal custody in connection with an action pending in the Southern District of New York.  Eisenberg has never been registered with the Commission.

## IV.    FACTS

### A.    Overview of Digital Assets

14.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital assets include virtual currencies, such as bitcoin (BTC), ether (ETH), and USD Coin (USDC), which are digital representations of value that function as mediums of exchange, units of account, and/or stores of value.

15.     USDC is a type of virtual currency called a "stablecoin," meaning that it is supposed to be redeemable on a 1:1 basis with the U.S. dollar.  It is the second-largest stablecoin by market capitalization, with billions of dollars of USDC changing hands every day.  It functions primarily as a store of value, a unit of account, and a medium of exchange for the purchase of goods and services and the purchase of other digital assets.  Circle, the company that created and, as part of a consortium, manages USDC, represents that USDC is backed 100% by reserves.  Certain digital assets are "commodities" in interstate commerce, including BTC, ETH, USDC, and others, as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

16.     Although USDC is intended to be redeemable on a 1:1 basis with the dollar, in actuality it does not track the dollar exactly.  Since its inception in 2018, the price of USDC has ranged between $0.89 and $1.19.  Stablecoins are also subject to risks.  One such risk is that stablecoins can be vulnerable to runs, in which a sudden spike in redemption requests triggers concerns that the stablecoin issuer may not be able to meet future redemption requests in full.  In such instances, a stablecoin may break its "peg" to the U.S. dollar and begin trading lower.  Stablecoins are also susceptible to operational risks, including fraud and cyber risks.

17.     A "blockchain" is a distributed, shared, immutable ledger that facilitates the process of recording transactions and tracking digital assets in a consensus-based network.

18.     A "smart contract" is a self-enforcing piece of computer code that can contain all terms of a contract—meaning the software can execute the agreement contained in the contract without additional input from the parties.

**B.     Mango Markets and Swaps**

19.     Mango Markets is a so-called decentralized digital asset exchange.  It was built on the Solana blockchain and launched in early 2021 by developers located in the United States and overseas.  It suspended operations shortly after Defendant's manipulative and deceptive scheme drained the platform of most of its assets.

20.     During the Relevant Period, Mango Markets operated a collection of smart contracts that purported to facilitate digital asset transactions without the need for intermediaries. Mango Markets operated through a website that was accessible to the general public, including to persons in the Southern District of New York.  The exchange was developed and operated in part from within the United States by persons and entities residing in and based in the United States.

21.     Mango Markets purports to be governed by a decentralized autonomous organization ("DAO") called the Mango DAO.  At least one member of the Mango DAO resides in the United States.

22.     During the Relevant Period, Mango Markets users could engage in spot and margined trading of digital assets such as bitcoin, ether, and USDC.  Mango Markets users could also trade MNGO, the "native" token of Mango Markets.  The MNGO token traded globally, including on digital asset exchanges accessible to persons in the United States, during the relevant period.  MNGO functions as the governance token of the Mango DAO, meaning that

MNGO token holders may vote those tokens to govern (e.g., to modify, operate, market, and take other actions with respect to) Mango Markets. It is conveyed as a "reward" to market makers for providing liquidity to Mango Markets's swaps markets. MNGO holders receive a one basis point discount on trading fees on the exchange. And MNGO can be deposited with Mango Markets to earn interest.

23.     In addition to spot and margined trading of digital assets, Mango Markets operated a platform for the trading of swaps. During the Relevant Period, Mango Markets offered to enter into, entered into, executed, and/or confirmed the execution of swaps and conducted business in the United States for the purpose of soliciting or accepting orders for or otherwise dealing in swaps. Of relevance here, Mango Markets allowed users to execute MNGO-USDC Swaps, which provide for the exchange of one or more payments based on the relative value of MNGO and USDC. "Perpetual futures" and "perpetuals" such as the MNGO-USDC Swaps meet the definition of "swaps" under the Act. 7 U.S.C. § 1a(47); 17 C.F.R. § 1.3.

24.     Swaps like the MNGO-USDC Swaps transfer, as between the parties to the transaction, the financial risk associated with a future change in one or more commodities without conveying a current or future direct or indirect ownership interest in those commodities. Unlike many futures and swaps, "perpetuals" have no expiration date.

25.     The price of a "perpetual" closely tracks the price of the underlying assets. An investor with a long position in this type of swap will profit if the value of the underlying asset increases and lose money if the value of the underlying asset decreases. Conversely, an investor with a short position in this swap will lose money if the value of the underlying asset increases and profit if the value of the underlying asset decreases.

26.     Mango Markets's swap contracts, including the MNGO-USDC Swaps, operated through smart contracts and did not require that any user provide any identifying information like a name or address.  The MNGO-USDC Swaps settled in USDC, meaning that proceeds from the swaps were paid in USDC.

27.     In addition to trading, Mango Markets allowed users to engage in digital asset transactions it called "borrowing and lending."  Mango Markets's borrowing and lending functionality allowed users to deposit various digital assets as "collateral," and to withdraw other digital assets up to a certain amount depending on the amount of collateral.  The maximum amount available to "borrow" was primarily based on, among other things, the amount of deposited collateral and the value of the borrower's portfolio on Mango Markets.

28.     Mango Markets had a DAO-controlled reserve fund that provided a partial backstop to lenders in the event that the collateral of a liquidated account was insufficient to cover the borrowed amount.

**C.     Eisenberg's Manipulative and Deceptive Scheme**

29.     On October 11, 2022, while located within the United States, Eisenberg manipulated the spot price of MNGO and the value of MNGO-USDC Swaps in order to illicitly obtain approximately $114 million from Mango Markets.

30.     The Oracle employed by Mango Markets provided a data feed of digital asset prices sourced from the three Oracle Exchanges.  It averaged digital asset prices from the Oracle Exchanges, and Mango Markets used the resulting average prices to set trading prices on its own platform.  By virtue of the Oracle, a change in the price of MNGO or USDC on Exchanges 1, 2, or 3 would cause a change in price of MNGO or USDC on Mango Markets and also a corresponding change in price of MNGO-USDC Swaps.

31.     Prior to October 11, 2022, Eisenberg created two anonymous accounts at Mango Markets and funded each with $5 million in USDC.  In one account ("Account 1"), Eisenberg established a $19 million long position (using leverage) consisting of over 400 million MNGO-USDC Swaps at a price of approximately $0.04.  And in the second account ("Account 2"), Eisenberg established a $19 million short position consisting of the same number of MNGO-USDC Swaps.  In this way, Defendant placed himself on both sides of the same transaction, which effectively resulted in a "wash" transaction.  Because Mango Markets did not require any identifying information in order to trade on the platform, Eisenberg was able to create both accounts anonymously, thereby concealing from Mango Markets the fact that he was on both sides of this transaction.

32.     On October 11, 2022, Defendant bought large volumes of MNGO on each of the three Oracle Exchanges during the same 30-minute period.  Defendant's choice of exchanges was no coincidence:  he chose to trade on the Oracle Exchanges because he knew that inflating the price of MNGO on those exchanges would cause the Oracle to report artificial prices to Mango Markets, and Mango Markets would use those artificial prices to value Defendant's MNGO-USDC Swaps.  Defendant further knew that MNGO was relatively illiquid (i.e., it had a low trade volume), and therefore his purchases of MNGO on the Oracle Exchanges would substantially inflate the price of MNGO on each exchange.

33.     In furtherance of his fraudulent scheme, Defendant opened his account at Exchange 1 using a false name and false identification.

34.     Defendant opened an account on Exchange 2 on October 11, 2022.  To open the account, Defendant used an anonymous email address, did not provide his name, and used a virtual private network ("VPN") that falsely or misleadingly showed his location as Poland.

Between October 1 and October 10, MNGO traded in a narrow range of approximately $0.04.[1]

Shortly thereafter, between approximately 6:26 p.m. and 6:45 p.m., Defendant paid over $75,000 for over 1 million MNGO on Exchange 2.  During that time, the price of MNGO rose over ten-fold on Exchange 2 from approximately $0.04 to $0.45.  Daily 24-hour MNGO trade volumes on Exchange 2 between October 1 and October 10 ranged between 2.5 million and 3.2 million—on average, approximately 120,000 per hour.  Defendant's purchase of over 1 million MNGO in a 30-minute span on Exchange 2 was therefore highly anomalous.  During the rest of October, between October 12 and October 31, MNGO traded between approximately $0.015 and $0.029.

35.     Defendant engaged in a similar pattern of large purchases of MNGO on Exchanges 1 and 3 in the same short timeframe.  As a result of Defendant's large purchases, the price of MNGO rose from approximately $0.04 to artificial prices of $0.13 on Exchange 1 and $0.91 on Exchange 3 at or around 6:45 p.m. on October 11, 2022.

36.     Through these transactions on the Oracle Exchanges, Defendant intended to generate false or misleading signals of legitimate market demand for MNGO.  Defendant further intended for his trading to cause (and did cause) significant short-term impacts on the prevailing price of MNGO on the Oracle Exchanges and intended to cause (and did cause) artificial prices for MNGO on those exchanges.

37.     Defendant knew that the price of MNGO-USDC Swaps was based on the prices of MNGO and USDC determined by the Oracle, which in turn were based on the prevailing spot market prices at the Oracle Exchanges.  Through his manipulation of MNGO, Defendant further intended to cause (and did cause) a significant short-term impact on the price and value of his

---

[1] Prices on the Oracle Exchanges and on Mango Markets were variously quoted in U.S. dollars, USDT (another stablecoin), and USDC.  For simplicity, to avoid confusion, and because the prices of USDT and USDC approximated $1.00 during the Relevant Period, this Complaint generally quotes prices in U.S. dollars.

long MNGO-USDC Swaps held at Mango Markets and intended to cause (and did cause) an artificial price of those swaps.

38.     During the same short period of time in which Defendant manipulated the price of MNGO on the Oracle Exchanges, the price of MNGO-USDC Swaps rose from approximately $0.04 to $0.54.  Defendant's manipulation of MNGO caused the value of his long MNGO-USDC Swaps to increase over ten-fold, from approximately $19 million to an artificial value of over $200 million.  Defendant's manipulation of MNGO also caused the value of his short MNGO-USDC Swaps to decline substantially, as Defendant expected, in his pursuit of a larger payday.  Defendant needed to establish the short position to ensure that there was a counterparty to his long position to complete the swaps.  The most he could lose in his short account was the $5 million he initially deposited, which was far less than the artificial appreciation of his swaps position in his long account and far less than the value of his ultimate prize: the over $100 million in funds held by Mango Markets that he intended to steal.

39.     Immediately upon his long MNGO-USDC Swaps being valued by Mango Markets at a substantially inflated price, Defendant used the inflated value of the swaps as collateral to "borrow" $114 million from Mango Markets in the form of USDC, USDT, and various other digital assets, derived from deposits of other Mango Markets users, comprising all available lending liquidity on the platform.  These liquidity-depleting actions were possible only because Eisenberg's manipulation of MNGO and the MNGO-USDC Swaps deceived Mango Markets and market participants regarding the true value of his collateral.  After withdrawing the digital assets, Defendant quickly moved his illicitly acquired funds to other platforms outside Mango Markets's reach.

40.     When Defendant withdrew these funds, he intentionally and misleadingly failed to disclose among other things, that (1) he had perpetrated a manipulative scheme to artificially inflate the value of his collateral, and (2) he intended to default on his obligation to deposit the appropriate amount of "borrowed" digital assets.

41.     After Eisenberg drained all liquidity from Mango Markets and ceased his manipulation of MNGO, the artificial prices created by Defendant deflated, and the price of MNGO quickly dropped to approximately $0.02 (which was below the pre-manipulation price of $0.04).  The artificial price of the MNGO-USDC Swaps—the collateral securing the "borrowed" digital assets—correspondingly evaporated as well.

42.     Eisenberg's spot purchases of MNGO on October 11, 2022 were extremely anomalous given the historical prices and trading volumes of MNGO, and his large matched MNGO-USDC Swap trades constituted manipulative wash trading.  In addition, the immediate withdrawal of his unrealized gains in the form of other unmanipulated digital assets, including bitcoin, ether and Tether, signals that Eisenberg was aware that the market price of MNGO would rapidly collapse after his manipulative purchases ceased.

43.     On October 12, in an attempt to evade his liability and culpability, Defendant submitted a proposal to the Mango DAO offering to return a portion of his misappropriated assets (approximately $51 million at then-current market prices) if Mango Markets agreed, among other things, to "not pursue any criminal investigations or freezing of funds," and to treat the remaining approximately $65 million as a "bug bounty" payment to Defendant.  A "bug bounty," as it is called in the decentralized finance platform environment, is a form of compensation that may be awarded for reporting software vulnerabilities.  Mango Markets, like many other purported decentralized finance platforms, offered bug bounties, which were

discretionary and subject to a vote of the Mango DAO.  Mango Markets published criteria for bug bounties, which stated that bounties would be equal to 10% of the amount that could have been stolen through the identified vulnerability, up to a maximum of $1 million.  The criteria further stated that vulnerabilities that had already been exploited by the reporting person were ineligible for bug bounties.

44.     Shortly thereafter, Eisenberg submitted a revised governance proposal stipulating that he would return approximately $67 million of the stolen tokens, $47 million would be kept by him as a purported bug bounty, and Mango Markets would not pursue any criminal investigations or freezing of funds.  The Mango DAO approved this proposal on October 13. Shortly thereafter, Eisenberg returned approximately $67 million to Mango Markets in the form of USDC and Solana (another digital asset).  Thereafter, using $25 million from its own treasury in addition to the funds returned by Defendant, Mango Markets implemented a program to compensate Mango Markets users who were negatively impacted by Defendant's scheme.

### D.     Eisenberg Admits to His Scheme

45.     Defendant maintained an account on Discord, a chatroom and messaging platform.  On October 5, 2022, as reported by an independent journalist who claimed to have been in a private Discord chat with the Defendant, Eisenberg stated, "I'm investigating a platform that could maybe lead to a 9 figure payday.  Should I do it."  Another participant on the server asked if Defendant's scheme "is . . . just one of those oracle manipulatooor [sic] things to drain LPs [liquidity pools on digital asset exchanges]."  Defendant responded:  "Sorta.  ***You take a long position.  And then you make numba [sic] go up***.  ***And then you withdraw all protocol***

***TVL [total value locked[2]].***"  He further noted there was a risk because "there's a bit unknown about how much hidden liquidity steps in," meaning that his manipulation scheme would not work if MNGO was more liquid than he thought.  The journalist posted screenshots of Defendant's Discord statements online.  Following Eisenberg's theft from Mango Markets, he reportedly emailed the same independent journalist and noted that he had been "exploring a number of lending platforms with exposure to low-cap [i.e., market capitalization] coins."  Digital assets with low market capitalization are typically less liquid and more susceptible to manipulation.

46.      During the Relevant Period, Defendant maintained a Twitter account.  On October 15, 2022, Defendant admitted his actions in a series of tweets (consolidated for ease of reading below), writing:

> ***I was involved with a team that operated a highly profitable trading strategy last week.***  I believe all of our actions were legal open market actions, using the protocol as designed, even if the development team did not fully anticipate all the consequences of setting parameters the way they are.  Unfortunately, the exchange this took place on, Mango Markets, became insolvent as a result, with the insurance fund being insufficient to cover all liquidations.  This led to other users being unable to access their funds.  To remedy the situation, I helped negotiate a settlement agreement with the insurance fund with the goal of making all users whole as soon as possible as well as recapitalizing the exchange.  This is similar to how auto deleveraging works on exchanges such as Binance and Bitmex, clawing back some profits from profitable traders in order to ensure all users [sic] funds are protected.  As a result of this agreement, once the Mango team finishes processing, all users will be able to access their deposits in full with no loss of funds.

47.      Contrary to his purported belief that his actions were legal, in fact, they constituted blatant manipulation of spot prices and swaps.

---

[2] Total value locked ("TVL") is the total amount of user funds invested a decentralized finance protocol.

## V.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I—Use of a Manipulative or Deceptive Device
### Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)(1)-(3) (2022)

48.     Paragraphs 1 through 47 are re-alleged and incorporated herein by reference.

49.     7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

50.     17 C.F.R. § 180.1(a), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:  (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

51.     The MNGO-USDC Swaps meet the definition of  "swaps" under 7 U.S.C. § 1a(47) and 17 C.F.R. § 1.3 and, as such, are subject to the prohibitions of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

52.     During the Relevant Period, as described above, Defendant engaged in a scheme to manipulate the price of MNGO, manipulate the price of MNGO-USDC Swaps, and use the artificially inflated value of his MNGO-USDC Swaps as collateral to withdraw by means of interstate commerce, digital asset commodities, including bitcoin, ether and Tether, from Mango

Markets.  By such conduct, Defendant misappropriated over $100 million worth of those commodities.

53.     By the foregoing conduct, Defendant directly or indirectly used or employed or attempted to use or employ a manipulative device, scheme, or artifice to defraud.

54.     By the foregoing conduct, Defendant made, or attempted to make, untrue or misleading statements of a material fact or omitted to state material facts necessary in order to make the statements made not untrue or misleading.

55.     Defendant engaged in the acts and practices described above intentionally or recklessly.

56.     By this conduct, Defendant violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

57.     Each and every false or misleading statement and overt action in furtherance of the use or attempted use of a manipulative or deceptive device or contrivance is alleged herein as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

### Count II—Manipulation and Attempted Manipulation of a Swap
**Violations of Section 6(c)(3) and 9(a)(2) of the Act, 7 U.S.C. §§ 9(3), 13(a)(2), and Regulation 180.2, 17 C.F.R. § 180.2 (2022)**

58.     Paragraphs 1 through 57 are re-alleged and incorporated herein by reference

59.     7 U.S.C. § 9(3) makes it unlawful for any person, directly or indirectly, to "manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

60.     17 C.F.R. § 180.2 provides: "It shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

61.     7 U.S.C. § 13(a)(2) provides it shall be illegal to "manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap."

62.     The MNGO-USDC Swaps are "swaps" subject to the prohibitions of 7 U.S.C. §§ 9(3) and 13(a)(2) and 17 C.F.R. § 180.2.

63.     By the foregoing conduct, through means of interstate commerce, Defendant manipulated or attempted to manipulate the price of MNGO-USDC Swaps in violation of 7 U.S.C. §§ 9(3) and 13(a)(2), and 17 C.F.R. § 180.2.

64.     Each and every overt action in furtherance of the manipulation and attempted price manipulation is alleged herein as a separate and distinct violation of 7 U.S.C. §§ 9(3) and 13(a)(2), and 17 C.F.R. § 180.2.

## VI.     <u>RELIEF REQUESTED</u>

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.  An order finding that Defendant violated Sections 6(c)(1), 6(c)(3), and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), (3), 13(a)(2), and Regulations 180.1(a) and 180.2, 17 C.F.R. §§ 180.1(a), 180.2 (2022);

B.  An order of permanent injunction enjoining Defendant and any other person or entity associated with him, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with Defendant, including any successor thereof, from:

   i.  Engaging, directly or indirectly, in conduct in violation of 7 U.S.C. §§ 9(1), (3), 13(a)(2), and 17 C.F.R. §§ 180.1(a), 180.2;

ii.   Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

iii.   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), or digital assets that are commodities, as that term is described herein, for their own personal account(s) or for any account in which the Defendant has a direct or indirect interest;

iv.   Having any commodity interests or digital assets that are commodities, as that term is described herein, traded on the Defendant's behalf;

v.   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital assets that are commodities, as that term is described herein;

vi.   Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interest or digital assets that are commodities, as that term is described herein;

vii.   Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and/or

viii.   Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any

person (as that term is defined in 7 U.S.C. § 1a(38), registered, exempted

from registration, or required to be registered with the Commission except

as provided for in 17 C.F.R. § 4.14(a)(9));

C.  An order requiring Defendant to pay a civil monetary penalty of not more than the

civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-

1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation

Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title

VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2022),

for each violation of the Act or Regulations, plus post-judgment interest;

D.  An order directing Defendant, as well as any successors thereof, to disgorge,

pursuant to such procedure as the Court may order, all benefits received

including, but not limited to, trading profits, revenues, salaries, commissions,

fees, or loans derived directly or indirectly from acts or practices which constitute

violations of the Act and Regulations, as described herein, and pre- and post-

judgment interest thereon from the date of such violations;

E.  An order directing Defendant, as well as any successors thereof, to make full

restitution, pursuant to such procedure as the Court may order, to every customer

and investor whose funds Defendant received, or caused another person or entity

to receive, as a result of the acts and practices constituting violations of the Act

and Regulations, as described herein, and pre- and post-judgment interest thereon

from the date of such violations;

F.  An order directing Defendant, as well as any successors thereof, to rescind,

pursuant to such procedure as the Court may order, all contracts and agreements,

whether express or implied, entered into between, with, or among Defendant and any customer or investor whose funds were received by the Defendant as a result of the acts and practices which constituted violations of the Act and the Regulations, as described herein;

G. An order directing that Defendant, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least the beginning of the Relevant Period to the date of such accounting;

H. An order requiring Defendant and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

I. An order providing such other and further relief as the Court deems proper.

*      *      *

## VII.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial.

Dated:  January 9, 2023

**COMMODITY FUTURES TRADING
COMMISSION**

By:  /s/ *John C. Murphy*
John C. Murphy
Jacob Mermelstein
Trial Attorneys
jmurphy@cftc.gov
jmermelstein@cftc.gov
Phone: (646) 746-9700

K. Brent Tomer
Chief Trial Attorney
ktomer@cftc.gov
Phone: (646) 746-9700

Manal M. Sultan
Deputy Director
msultan@cftc.gov
Phone: (646) 746-9700

Commodity Futures Trading Commission
Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9940

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION